## Rice v. Commonwealth.
April 28, 1939.

W. L. HAMMOND for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The grand jury of Bell county indicted appellant and defendant below, Arvil Rice, in which he was accused of murdering one Walter Dorfman by shooting him with a pistol, from the effects of which he immediately died. The indictment was returned on August 4, 1938, and appellant's trial was had on November 17 of the same year. Upon the calling of the case for trial counsel moved that the regular venire summoned for services at that term of the court be discharged, on the ground that in drawing it the court had drawn from the wheel and put on the jury list 38 names of persons to be summoned on that jury instead of 36 names as specified in the applicable statute. Kentucky Statutes, sec. 2243. The motion was overruled on the ground that in drawing the names to make up that list of jurors the names of two persons were drawn whom the court personally knew had died since the jury commissioners had put their names in the wheel, but he nevertheless entered those two names on the jury list and neglected to erase them. Of course, neither of them was summoned. It requires no lengthy elaboration of comment, or discussion, to conclude that the alleged error was and is wholly groundless, even if it should be held that the point possessed merit if the two names in excess of that prescribed by the statute were living persons and qualified for jury service, but which is extremely doubtful.

Following the disposition of that motion the case was called for trial and defendant—who was represented by three attorneys—stood up in open court by the side of his present briefing counsel and waived the formalities of an arraignment and entered a plea of guilty to the indictment, which, of course, charged only inexcusable and unmitigated murder. But before the court would permit the entry of such a plea, he proceeded to interrogate defendant and at the same time warned him of the consequences of such a plea. The court stenographer took down the examination of defendant on that occasion, as well as his answers to the questions of the court, and later transcribed them, and which is made a part of this record, all of which we now copy:

"What is your plea in this case? A. Guilty.

"Q. Do you understand what a plea of guilty means? A. Yes, sir.

"Q. What is that? A. Life, or death, I reckon.

"Q. Do you understand it will be my duty to instruct the jury to find you guilty and to fix punishment at death, or at confinement in the penitentiary for life? A. Yes sir.

"Q. With that understanding, do you want to enter this plea? A. Yes sir.

"Q. Have you seen this paper (confession) here before? A. Yes sir.

"Q. Is it your desire that this be read to the jury as your evidence in this case? A. Yes sir."

Pursuant thereto, and carrying out the previous agreement and understanding between prosecuting and defending counsel—which appears to have been approved by the defendant and his relatives who were then present—the commonwealth's attorney read to the jury a written and sworn to confession made by appellant out of court, and so far as this record discloses, voluntarily and of his own free will. The confession in its entirety is too lengthy to be inserted verbatim in this opinion. It contains a brief history of the acts and doings of appellant some few days before the fatal occasion until he arrived at Loyal, a town in Harlan County, Kentucky, where he observed his victim riding in an automobile, alone, and appellant "thumbed" for him to stop, which he did, and appellant got into his victim's automobile for the purpose of going with him as far as Pineville. In the meantime appellant was armed with a pistol which was concealed from his victim. When they neared Pineville where the road leading to Middlesboro turned south appellant drew his weapon and ordered his victim to take the Middlesboro road, and which command was promptly obeyed. The weapon remained unconcealed from then on. After they had gone through Middlesboro the driver was ordered by defendant to stop and get out and to retire into the bordering woodland and totally undress himself against which he protested, but of no avail. So the victim, according to the confession, "pulled off his tie, shirt, and coat," and then begged to be excused from further disrobing. The confession then continues with this—"He walked across the highway and down to the edge of a creek on the left hand side of the highway. After he got to the creek he asked me if he could put his clothes back on. I told him that if he pulled off all of his clothes and took his time

about getting to Middlesboro, Kentucky, that he would find his car in Covington, Kentucky, unhurt. * * * I had followed him back down to the creek. I was right by him when he grabbed me,'' which it is explained was done by the victim in order to disarm appellant who at that time had his pistol in his hands. The confession then says: ''When he grabbed me I hit him in the head with my gun which I had in my right hand. When I hit him it just staggered him a little. He still held to me and I hit him again. The second blow did not knock him down. He was pulling me up to him and I put the gun close to him and told him to quit. He hit my wrist or elbow and that caused the gun to go off.'' The shot penetrated a vital part of the body of the victim producing his death. The remaining part of the confession tells about appellant taking his victim's car and rambling about over the country until he was apprehended and accused of the murder.

No other evidence was introduced, offered or tendered by either side, and the court instructed the jury to find the defendant guilty as charged in the indictment, with an affixed punishment of either death or life confinement in the penitentiary. Pursuant to the prior understanding above referred to no argument of the case was made to the jury by either side, and it returned the verdict referred to.

Two days after the return of the verdict a motion for a new trial was filed, signed by all three of defendant's counsel, containing three alleged grounds for a reversal—the first of which was the alleged error of the court with reference to impaneling the jury hereinbefore referred to and disposed of. The second one attacked the verdict because the court failed to give to the jury the whole law of the case, in that it should have submitted an instruction on accidental killing, voluntary manslaughter, involuntary manslaughter, and one instructing the jury as to its duty if it entertained a reasonable doubt as to the degree of the offense of which defendant was found guilty. The third ground was an alleged error committed by the court growing out of the voir dire examination of the jurors as they were being selected to try the case. Two days after the filing of that motion two of the attorneys representing defendant—and who were first employed by him—filed what they denominated an ''Additional Motion and ground for a new trial.'' It consisted in developing a contro-

versy occurring before entering into the trial between the third and two first employed counsel representing defendant, the third one being later employed by his mother and relatives, following the employment of the first two, who signed the additional motion and reasons. It is set out in the latter motion that the first two employed counsel had framed up a defense (but nowhere stated) and intended to present it when the third employed counsel came into the case—he being the one in whom defendant's relatives placed the greatest confidence and, perhaps, also the defendant himself—and that a conference was had after the employment of the third attorney and he was of the opinion that the best chance to obtain a punishment less than death would be to plead guilty and thereby show a repentant disposition, which, together with defendant's age (19 years), would most likely result in the lesser punishment of life imprisonment. That suggestion was adopted at the time, so far as the record discloses, by all parties concerned, and the first two employed counsel went into court on the day the trial was had in company with the other one, their client, and the latter's relatives, with that strategy well matured.

When it was announced that a plea of guilty would be entered the court rather hesitated and would not permit it to be done without an examination of defendant in open court, and which examination we have hereinbefore inserted. In the selection of the jury one of the first employed counsel—and the only one who signs brief for appellant on this appeal—took the leading part in making that selection and in examining tendered jurors. The additional motion and reasons for a new trial bitterly complain of the course pursued after it became abortive by the verdict of death instead of life imprisonment. In that motion what is termed as ''fallacious action'' in entering the plea of guilty is bitterly criticised, a part of which says: ''It further appears that defendant had nothing to do except what his attorneys advised him, and that advice was not intelligent enough to interest any attorney that had ever been in a court room before.'' That statement may or may not be true, but, nevertheless, the course pursued, so far as the record discloses, was a well matured one after deliberate consultation between all parties concerned, and no one is accused of any deceit, fraud, or collusion in bringing it about.

The case on this point, therefore reduces itself to a frank acknowledgment that the practice pursued was developed and taken in the hope that the ameliorated punishment would be inflicted by the jury instead of the more severe one, but that its members concluded otherwise and inflicted the severer punishment of death; and the court is deliberately asked to extricate defendant from the perilous situation that the verdict created. The court overruled both motions for a new trial, and, after most painstaking thought given to every question raised, it is our conclusion that he correctly did so. Not only do we so conclude from the universally applied rules in the practice of criminal prosecutions, but if precedent were necessary, then this court in the case of White v. Com., 140 Ky. 9, 130 S. W. 796, 797, likewise so concluded upon facts very analogous to those appearing in this case, except the facts therein were more appealing to order a reversal of the conviction than is true under the facts of this one. The convicted defendant in that case was only 17 years of age and one of his counsel was absent at the time of the trial. No motion was made for a continuance of the cause on account of such absence and the case was tried altogether on a plea of guilty made by defendant which we said in our opinion was done after he had "consulted with several high officials in the county, who had taken an interest in seeing that the defendant had justice done him, and they concurred in the belief that it was best for the defendant to plead guilty." Here defendant consulted with his combined counsel, his mother and, perhaps, others interested in his welfare, and when it came time to take action in the matter he was fully advised by the court. Nevertheless he solemnly entered his plea with the avowed understanding of what it meant, as well as its possible consequences. In the circumstances a statement made by us in the opinion written in the White case is most pertinently applicable. That statement was: "To reverse the judgment of the court in this case under these circumstances would be to make a trial for crime a mere mockery."

The contention made in support of ground (2) is unique to say the least of it. The indictment charged that defendant committed the murderous homicide "wilfully, maliciously and of his malice aforethought." To that charge defendant, in the circumstances and in the manner indicated, entered a plea of guilty. Guilty of

what? Manifestly, and exclusively of the malicious murder charge (which was the only one preferred) contained in the indictment to which that plea was made. In such circumstances it is farcial to contend that constitutional courts created for the punishment of crime, and for the settlement of human rights according to law and justice, could properly be called upon—or if so, could countenance for a moment any such contention as is embodied in this ground (2). The confession, which by agreement was read to the jury, made no claim whatever that the homicide was of any less degree than deliberate murder. It is true that the confessor therein (defendant) made the statement that deceased hit his wrist or elbow, which caused the gun to go off, but he nowhere claimed in express terms that the shot was produced by any accident. The action of the deceased was clearly done in the exercise of his right of self-defense, since the pistol was at the time shoved up against his side, and he had previously been struck with it twice on the head by defendant. Surely, counsel would scarcely have the temerity to contend that the murdered deceased, in the circumstances, did not have the right to try to disarm defendant. If in making that effort the weapon—being adjusted for immediate and deadly action by defendant—was caused to fire, the last person in the world who might shelter himself under an accidental shooting would be defendant, who maliciously and voluntarily brought about and created the situation (the danger to his victim) and all for a premeditated, heinous and criminal purpose. It was a feloniously invited accident if one at all.

In the stenographer's transcript of testimony, taken and heard at the trial, the agreement under which the practice pursued was had is set out, and there was not the slightest variation therefrom. A part of it says: "That this confession is true and correct and that it was given by the defendant voluntarily, freely and without coercion or any promise or hope of immunity or reward," and in which, we repeat, there is no express claim of excusable accidental homicide. The situation might be likened unto that of one interposing the right of self-defense which though sustained by the evidence is not available to him because he committed the first deadly assault on his victim without in good faith thereafter retiring from the difficulty. In such a situation he is denied the aid and effect of his self-defense plea, and

we can see no reason for drawing a distinction between the rule applicable to that defense and the one of accidental shooting. Defendant in this case was doing more than engaging in reckless handling of fire arms or deadly weapons. He was actually engaged in the perpetration of a felony which he had premeditatedly designed, and which was the taking of the automobile of his victim and appropriating it to his own use either temporarily or permanently. He was likewise engaged in the commission of a felony by assaulting his victim with a deadly weapon, and in such circumstances the contention of counsel in their effort to sustain this ground are far afield from the law and proper and correct practice.

On the voir dire examination of the jury the member of defendant's counsel who filed the additional motion and reasons for a new trial—uncovering alleged disputations between defendant's counsel—and the one who filed the brief in his behalf in this appeal, asked one of the jurors, "If you could give him (defendant) the benefit of the doubt and resolve any doubt you might have in his favor, under the proper instructions of the court." The court then suggested that he did not think it was proper in such an examination to "single out certain things," but that the juror should be asked if he could try the case according to the evidence and the instructions, and it is that occurrence and incidence that forms the basis of ground (3). To begin with, we do not think the court committed an error in the action taken by him; but were it otherwise, then it is impossible to conceive how such alleged error could prejudice defendant's rights, since the juror, if he was qualified to act as such at all, is required only to exercise his discretion as permitted under the evidence and the instructions of the court. We can discover no possible merit in this ground.

It is argued in brief—though not expressly relied on in the motion for a new trial—that the only instruction given by the court was erroneous in that it did not contain the expression "in your discretion," or a similar one, as a guide to the jury in determining what degree of punishment it would inflict. The attacked instruction (which was the only one given to the jury) said: "Gentlemen of the Jury: The defendant, Arvil Rice, entered a plea that he is guilty to this indictment of wilful murder. It will therefore be your duty to find the defendant guilty and to fix his punishment at death,

or at confinement in the State penitentiary for and during his natural life.'' It is insisted that immediately following the word ''penitentiary'' as contained in that instruction, the court should have inserted, ''in your sound discretion,'' or some other similar expression. But while such language is frequently employed in instructions of the nature and kind under consideration, we know of no rule of law absolutely requiring it, since after all it adds nothing to the instructions as framed without containing such an expression, for without it the jury is plainly told that they had the right and authority to return either the severer or lighter punishment for the crime committed, and which by necessary implication said to them ''in the exercise of your sound discretion.'' Such an objection smacks of triviality and most assuredly possesses no materiality.

In considering this case the age of the defendant was an appealing and considered fact in our endeavor to find some error by which he might be relieved of his present perilous situation and be given another chance at which his punishment might possibly be mitigated and his life saved. But the record is absolutely barren of any ground permitting us to grant any such relief. The distinguished trial judge manifested extreme caution and most painstaking care throughout the trial in his determination to protect the rights of the defendant in every particular and at every stage of the trial. Neither he, nor we, nor any member of the jury, or any other one having connection with the trial, contributed in the least to the defendant's unfortunate dilemma. He was and is the sole author of it. If he and all other members of society who may contemplate such a course will not obey the law, they must expect to reap the consequences thereof, since civilized society can not otherwise exist without being reduced to a state of barbarism, to prevent which punishment for crime is inflicted and which is essential in the exercise of self-preservation and of the rights of each individual citizen in all civilized communities. In the circumstances of the case, as shown by the record, our duty, therefore, is plain and from presently prevailing conditions—of which we take judicial notice—there emanates a demand that we sincerely, earnestly and fearlessly perform it.

For the reasons stated, the judgment is affirmed; Whole Court sitting.